## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

LISA LOUISE JAYNE,                )
                                  )
       Plaintiff,               )
                                  )
    v.                          )    No. 18-cv-3159
                                  )
NANCY A. BERRYHILL,               )
Acting Commissioner of            )
Social Security,                  )
                                  )
       Defendant.               )

### OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Lisa Louise Jayne appeals from the denial of her application for Social Security Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Jayne filed a Motion for Summary Judgment (d/e 16).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 19).  The parties have consented to proceed before this Court.  Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered November 9, 2018 (d/e 15).  For the reasons set forth below, the Decision of the Commissioner is affirmed.

<u>STATEMENT OF FACTS</u>

Jayne was born on July 27, 1966. She secured a GED. She previously worked as an animal caretaker, home health attendant, and security guard. She suffers from degenerative disc disease of the cervical spine, right shoulder bursal surface tearing with tendonitis and osteoarthritic changes; moderate degenerative changes in the right hip; remote right knee meniscus tear; and depression and anxiety. R. 22, 29, 75, 351.

On December 31, 2012, Jayne saw Dr. Daniel OConnor, M.D., to establish care after her previous doctor retired. She reported shoulder pain that did not radiate. She also reported insomnia. She said the pain in her shoulder interfered with her sleep. R. 318-19. On examination, Jayne had no swelling or weakness, normal gait, normal mobility and curvature in her spine, full range of motion in all her extremities with no swelling, erythema, or effusion. She had no sensory loss. Jayne was oriented and demonstrated appropriate mood and affect. R. 321. Dr. OConnor renewed Jayne's prescription for Norco (hydrocodone-acetaminophen) at a reduced dosage. Dr. OConnor noted, "No early refill, and maybe no refill at all. I strongly recommend use of ibuprofen, but since she thinks she gets no results, it seems unlikely that she will take it." Dr. OConnor discontinued the prescription for tramadol because it made her "feel odd" and she reported that it provided no benefit. R. 318.

On January 23, 2013, Dr. OConnor wrote a letter regarding Jayne's work limitations due to her condition. Dr. OConnor recommended that Jayne should not lift more than 20 pounds and should not stand for more than two hours without a 10-minute break. R. 336.

On March 11, 2013, Jayne saw Dr. OConnor. Dr. OConnor noted,

> For a person in "severe" pain she sure looks comfortable and is able to move pretty well. This is starting to look like she may not need nearly so much medication, so I think the next time she comes back, if her records don't show some crippling radiography, we will begin scaling back her narc supply.

R. 322. On examination, Jayne displayed normal spine mobility and curvature, full range of motion in all extremities with, "Seemingly no limitation of movement." Her memory was intact, she was oriented, and she demonstrated appropriate mood and affect. R. 324. Dr. OConnor renewed her prescription for hydrocodone-acetaminophen and added a prescription for Ambien. R. 322.

On May 1, 2014, Jayne saw Dr. Natalie Greene, D.O., for high blood pressure. Dr. Greene noted that Jayne drank "about a 6 pack of beer per nigh (sic) especially on weekends." Dr. Greene also noted that Jayne was taking hydrocodone for pain. R. 327. On examination, Jayne had normal pulses and no edema. She was oriented; she had normal insight and judgment; and she demonstrated appropriate mood and affect. R. 329. Dr. Greene discontinued

the prescriptions for hydrocodone and Ambien.  She prescribed meloxicam (an NSAID) and gabapentin.  R. 325.

On May 15, 2014, Jayne saw Dr. Greene.  Jayne reported right arm pain. She said the pain was burning.  She also felt numbness.  She said the pain went from her neck to her elbow.  She said the gabapentin made her "queezy (sic)." She said she was taking Vicodin (hydrocodone-acetaminophen) that she got from a friend.  Dr. Greene did not order further testing because Jayne did not currently have insurance. R. 331.  On examination, Jayne had normal gait, normal spine mobility and curvature, sensation, and strength in both arms.  She had moderately reduced range of motion and severe crepitus in her right shoulder.  No edema was present.  Jayne was oriented, had normal insight and judgment, and had appropriate mood and affect.  R. 334.  Dr. Greene renewed her prescriptions for meloxicam and gabapentin.  Dr. Greene stated that if the NSAID did not improve her shoulder in a month, she would give Jayne a steroid injection.  R. 331.

On June 30, 2014, Jayne protectively filed for Disability Benefits.  She alleged that she became disabled on November 30, 2012.  R. 19.

On October 16, 2014, Jayne saw state agency psychologist Dr. Stephen Vincent, Ph.D., for a mental status assessment.  R. 351-53.  Upon completing the examination, Dr. Vincent concluded, in part:

> She has co-morbid symptoms and signs of anxiety and depression, with no history of any formal psychological and/or psychiatric treatment. She currently takes no prescribed antidepressant or anti-anxiety medications. She has not been psychiatrically hospitalized. She is currently not involved in any counseling efforts. She does prefer to withdraw and isolate. Cognitively she is intact.

Dr. Vincent assessed clinical impression was major depression, with anxious distress. R. 353.

On the same day October 16, 2014, Jayne saw state agency physician Dr. Raymond Leung, M.D., for a consultative physical examination. R. 354-57. Jayne denied any illegal drug use. She said she drank six to eight beers on weekends. She said she was taking meloxicam and hydrocodone. On examination, Jayne walked with a minimal limp without her cane. With the cane, "she would just lift the cane and was not using it to walk." She could walk 50 feet unassisted. She had difficulties walking on her heels and on her toes. She could squat ¼ of the way down. Straight leg raising bilaterally was to 35 degrees. She had decreased range of motion in her lumbar spine and shoulders. She had 5/5 strength in her left arm and hand. She had 4+/5 strength in her right arm and hand. She had 4+/5 strength in her legs. Her sensations were in normal limits. She had no edema. R. 356. Dr. Leung's mini mental examination results were normal. R. 355. Dr. Leung assessed slight right arm weakness, full range of motion in her cervical spine and limited range of motion in her lumbar spine and walking with a slight limp without her cane. 356-57.

On October 24, 2014, Jayne prepared a Function Report-Adult form. R. 245-52. Jayne reported that she lived alone in a house. Jayne said she could not work because of her back, neck, and shoulder pain. She also said she experienced nausea and headaches when she left home. She said she had panic or anxiety attacks when she was around a group of people or when she had appointments. R. 245.

Jayne said that in a typical day she got up, made coffee, took her meds, took care of her dog, watched television, took a nap, and played games on her phone. She also read the newspaper. She said that on a good day she would "try to tidy up the house or make a 'decent' meal." She said that two individuals Melissa Medders and Keith Vaughn help her take care of her pets. R. 246. Jayne said she did laundry, mowing, dusting, and cleaning once a week, but some weeks she did not perform these activities due to fatigue or pain. R. 247-49.

Jayne said she went outside once a day. She went out alone. She said that she drove. She went shopping once a month for groceries, toiletries, and cleaning supplies. She was able to pay bills, count change, handle her savings account, and use her checkbook. R. 248.

Jayne said that two or three times a week she communicated with "a few people I associate with" by phone, email, and text. She also attended occasional

barbeques with others.  She said that twice a month she listened to music with close friends.  R. 249.

Jayne reported that lifting more that 20 pounds caused pain.  She said that squatting, bending, and kneeling caused pain and she occasionally fell if she did not have something to hold onto.   She said that standing and walking caused pain and fatigue.  She indicated climbing stairs caused pain and fatigue.  She said she had trouble concentrating and understanding.  She could walk less than a block before she had to rest for 20 to 30 minutes.  R. 250.  Jayne said she used a cane to walk distances or when she was in a strange place.  She wore a knee brace when she drove her riding mower or when she had to lift heavy objects.  R. 251.

She did not follow written instructions well and she followed spoken instructions fairly well if she looked directly at the person who gave the instructions.  R. 250.  Jayne said she had issues with authority figures in the past.  She said that stress caused nervousness, headaches, and vomiting.  Changes in routine made her paranoid.  R. 251.

On November 15, 2014, state agency psychologist, Dr. Donald Henson, Ph.D., prepared a Psychiatric Review Technique.  R. 85-56.  Dr. Henson opined that Jayne suffered from an affective disorder and an anxiety disorder.  Dr. Henson also opined that her mental impairments caused moderate limitations on

her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence, or pace.  R. 85.

On November 19, 2014, state agency physician Dr. Julio Pardo, M.D., prepared a Physical Residual Functional Capacity Assessment.  Dr. Pardo opined that Jayne could occasionally lift 50 pounds and frequently lift 25 pounds, could stand and/or walk six hours in an eight-hour workday, and could sit six hours in an eight-hour workday.  Dr. Pardo found that Jayne had no other physical functional limitations.  R. 87-88.

On January 5, 2015, Jayne saw Dr. Greene.  Jayne reported that she had pain in her neck, shoulders, and arms.  Jayne said pushing and rotation aggravated her condition.  She described the pain as aching, piercing, and tingling.  She reported some loss of grip strength.  Jayne also said she just received her medical card.  R. 344-45, 381-82.  On a review of symptoms, Dr. Greene said that Jayne was negative for anxiety and depression.  R. 345, 382. On examination, Jayne's cervical spine was tender and had mildly reduced range of motion.  Her thoracic spine was tender.  Jayne had positive compression tests right and left.  She had normal grip strength bilaterally.  Her gait was normal. She had mildly decreased sensation.  She was oriented, had normal insight and judgment, and had normal mood and affect.  R. 346, 383.  Dr. Greene discontinued the prescriptions for meloxicam and hydrocodone-acetaminophen

and continued her prescription for gabapentin.  Dr. Greene ordered an MRI of Jayne's neck.  R. 344, 381.

On January 14, 2015, Jayne had an MRI of her cervical spine.  The MRI showed multilevel degenerative changes in her cervical spine with most pronounced foraminal and canal stenosis at C5-C6 with right worse than left.  No definite cord signal abnormality was identified.  R. 349.

On February 12, 2015, Jayne completed another Function Report-Adult form.  R. 266-73.  She said she could not work because she could not sit or stand for long periods; she could not lift or bend; she could not walk long distances; and she could not drive for any length of time.  R. 266.  During a typical day she made coffee, took medications, watched television, showered, did light housework, let her pets outside, and ate.  R. 267.  Jayne prepared meals with a microwave and crockpot.  She had no desire to make major meals, and reheated leftovers daily.  R. 268.  She also played games on her cell phone and occasionally read.  R. 270.  She said she could not do major housework. R. 267. She left the house to check the mail, mow, and go to appointments.  She drove, but had difficulty getting in and out of the car.  She went shopping twice a month. R. 269 She said she had problems with her sleep because of pain, anxiety, and panic attacks.  R. 267.  She later reported that she did all the housework, but no ironing or home repairs.  She mowed with a riding mower.  She said she did a

little housework every day. R. 268. She chatted daily with friends over the phone and on her computer and friends sometimes visited her in her home. R. 270.

Jayne said she could pay bills, count change, handle a savings account, and use a checkbook. She did not need reminders to go places and did not need anyone to go with her. She did not have any problems getting along with others. She said that she finished what she started, and she understood written and spoken instructions. R. 269-71.

Jayne said that her condition limited her ability to lift, stand, walk, bend, sit, concentrate, and climb stairs. She became short of breath when she climbed stairs. She did not know how far she could walk. She had to rest over 30 minutes after a walk and did not know how long she could pay attention. R. 271. She said she used a back brace and a cane. The devices were not prescribed but suggested. R. 272.

Jayne reported that she did not handle stress or changes in routine well. She said that she was terminated from a job at Global Security because she had problems with co-workers. She had fears of dying or sickness. R. 272.

On March 23, 2015, Jayne saw Dr. Greene. R. 384-86. Dr. Greene noted a history of moderate neck pain. She reported that she saw an orthopedic surgeon who told her she was not a candidate for surgery. R. 384. On a review of symptoms, Dr. Greene stated that Jayne was negative for anxiety and

depression.  R. 385.  On examination, Jayne had normal gait, normal spine, and normal extremities.  She was also oriented with normal judgment and insight, and appropriate mood and affect.  R. 386.  Dr. Greene scheduled Jayne an appointment with Pain Management.  Dr. Greene discontinued prescriptions for gabapentin and prescribed tramadol.  R. 384.

On April 8, 2015, state agency psychologist Dr. David L. Biscardi, Ph.D., prepared a Psychiatric Review Technique for Jayne.  R. 111-12.  Dr. Biscardi opined that Jayne suffered from an affective disorder and an anxiety disorder. Dr. Biscardi opined that her mental impairments caused mild limitations in her activities of daily living and her ability to maintain social functioning, and moderate limitations in her ability to maintain concentration, persistence, or pace. R. 112.

On April 23, 2015, Jayne saw Dr. Greene.  Jayne said she went to pain management.  The pain management heath care professional offered her physical therapy, but she refused.  The pain management health care professional refused to give her narcotic pain medication because Jayne had a history of cocaine addiction in her past.  The pain management providers also set Jayne up for spinal injections.  Jayne complained of continuing pain in her right shoulder.  She reported that she could not lift her right arm above her head.  R. 388.  On a review of symptoms, Dr. Greene said that Jayne had little interest or

pleasure in doing things, but did not feel down, depressed, or hopeless.  R. 389.
On examination, Jayne's gait, spine, and extremities were normal, except her
shoulders.  Jayne's right shoulder had decreased range of motion and crepitus
and her left shoulder had crepitus but better range of motion.  Jayne was
oriented with normal insight and judgment and appropriate mood and affect.  R.
390.

Dr. Greene ordered an MRI of her right arm and also started Jayne on
Zoloft for depression.  Jayne was also taking trazadone at bed time to help her
sleep.  R. 388.

On April 25, 2015, Jayne had an MRI of her right shoulder.  The MRI
showed bursal tearing of the anterior fibers of the supraspinatus tendon involving
25% to 50% of the thickness of the tendon; moderate tendonitis of shoulder
tendons with fraying and grade 1 strain of the supraspinatus tendon; and
osteoarthritic changes – moderate in acromioclavicular joint and mild in the
chondromalacia and glenohumeral joints.  R. 362.

On May 8, 2015, state agency physician Dr. Douglas Chang, M.D.,
prepared a Physical Residual Functional Capacity Assessment for Jayne.  R.
113-15.  Dr. Chang opined that Jayne could lift 20 pounds occasionally and 10
pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit
for six hours in an eight-hour workday; frequently climb ramps and stairs,

balance, kneel, crouch, and crawl; and occasionally stoop and climb ladders, ropes, and scaffolds.  R. 113-14.

On June 29, 2015, Jayne saw Dr. Greene for a "bug bite."  R. 389.  Dr. Greene stated that all of her review of symptoms was negative except that Jayne was positive for hives, pruritus, rash, and swelling.  On examination, Jayne's psychiatric examination was normal; Jayne was oriented and had normal judgment and insight and appropriate mood and affect.  R. 389.

On July 2, 2015, Jayne saw Dr. Alexander Pleszynski-Platz, M.D.,  for neck pain.  On examination, Jayne had decreased range of motion in her neck, but her neck was normal otherwise.  Dr. Pleszynski-Platz discussed pain management with Jayne.  R. 394.

On July 13, 2015, Jayne saw Dr. Pleszynski-Platz for renewal of her hydrocodone prescription.  Jayne was taking hydrocodone and tramadol for pain at the time.  R. 297.  She reported that the combination of the two medications helped with her pain.  She stated that the dosage of the hydrocodone might need to be raised.  R. 397.  A review of Jayne's symptoms was negative for depression and insomnia.  R. 399.  On examination, Jayne's neck was normal, and her extremities were normal.  Jayne was oriented with normal insight and judgment and appropriate mood and affect.  R. 400.

On July 28, 2015, Jayne saw Dr. Pleszynski-Platz for a pain medication refill. Jayne reported severe pain daily. She reported problems with her neck, back, shoulders, and spine. R. 401. In a review of symptoms, Dr. Pleszynski-Platz said that Jayne was negative for anxiety, depression, and insomnia. R. 403. On examination, Jayne's extremities were all normal. She was oriented with normal insight and judgment and appropriate mood and affect. R. 404. Jayne had positive Spurling maneuver more right than left.[1] Dr. Pleszynski-Platz stated that Jayne "does all the work at home herself. Adviced (sic) to rest supine to unlad (sic) the spine and reduce time and weight of loads." R. 401.

On August 26, 2015, Jayne saw Dr. Pleszynski-Platz for refill of her prescriptions for Norco and tramadol. Dr. Pleszynski-Platz noted:

> Impression    patient needs to stay active but also she works including mowing. That requires strengt (sic) and she has pains in r hip, thigh and shoulder forearm. There is a discopathy in L-S region but her main source of discomfort and pain is a strenououys (sic) activity at work,(sic) She needs to use pain meds. verty (sic) judiciously toi (sic) keep herself working..(sic)

R. 405. In a review of symptoms, Dr, Pleszynski-Platz said that Jayne was negative for anxiety and depression. R. 406. On examination, Jayne's extremities were normal. She had no edema. She was oriented and had normal

---

[1] The Spurling maneuver or test involves pressing on the top of the head while the patient rotates her head laterally. A result of pain radiating in to the upper limb indicates radiculopathy. Dorland's Illustrated Medical Dictionary (32nd ed. 2012 (Dorland's), at 1900. Dr. Pleszynski-Platz misspelled Spurling as Sourling. R. 401. In context, the Court finds that he was referring to the Spurling maneuver or test.

insight and judgment and appropriate mood and affect.  R. 407. Dr. Pleszynski-

Platz renewed her prescriptions. R. 405-06.

On October 9, 2015, Jayne saw Dr. Miguel Paniagua, M.D., for chronic

pain.  Jayne reported daily severe pain.  She wanted renewal of her hydrocodone

prescriptions.  Dr. Paniagua stated that ,

> [F]rom the beginning has become hostile and demanded just a refill
> of his (sic) medication and not give any face to face medical [history]
> since there wer (sic) other doctor (sic) here that ask the same
> questions and even the specialist has dismissed her to return to the
> local doctor to prescribe her medications, she will be given one
> oportunity (sic) to calm down and return prontly (sic) and will refill her
> medications.

R. 408.  Dr. Paniagua did not refill her prescription of hydrocodone.  R. 408.  The

record does not indicate that Dr. Paniagua conducted a physical examination.  R.

410.

On January 7, 2016 Jayne had x-rays of her right knee, pelvis, and right hip

taken.  The x-ray of the right knee showed no fracture and mild degenerative

changes.  R. 440.  The x-rays of the pelvis showed no fracture or dislocation and

degenerative changes of the right hip.  R. 441.  The x-rays of the right hip

showed no fracture or dislocation and moderate degenerative changes of the

right hip.  R. 442.

On January 28, 2016, Jayne saw nurse practitioner Brandy Byrd, CNP at

Comprehensive Pain Specialists for neck pain and right shoulder pain.  Jayne

said that her pain medication was very helpful.  Her right shoulder was doing a little better.  She was taking Norco and meloxicam.  R. 491.  The notes indicate Jayne first came to Comprehensive Pain Specialists on November 6, 2015.  She came because her new primary care physician would not prescribe narcotics and stopped her prescriptions for hydrocodone and tramadol.  R. 492.  Jayne said she had no adverse side effects from her medication.  Physical therapy exercises aggravated her neck, so she stopped going to physical therapy.  She said she did some of the exercises at home.  She said her right knee was very painful.  The knee swelled, popped, and often felt like it was going to give out.  She rated her pain as a 6 on scale of 1 to 10.  R. 491.  Jayne said that she did not have any depression or anxiety attacks.  She had panic attacks and insomnia.  R. 492.  Jayne took a self-administered test for depression.  Her test results were "subthreshold for depression."  R. 493.  On examination, Jayne had a normal mood.  She had a normal gait without assistive devices.  She had normal range of motion in her extremities.  She had decreased shoulder height on the right.  Her shoulders were positive for tenderness on palpation.  She had restricted range of motion in her shoulders.  Her right knee had moderate swelling, mild tenderness and crepitus.  Her knee was stable in all plains, with flexion to 120 degrees and extension to 0 degrees.  Byrd assessed right knee pain, opioid dependence, right hip pain, and shoulder pain.  Byrd refilled the prescription for

Norco and meloxicam.  She scheduled Jayne for a steroid injection in her right knee.  R. 494.

On February 12, 2016, Jayne saw nurse practitioner Byrd for right knee injury.  R. 488-90.  Byrd administered a steroid injection of Kenalog SDW into her right knee.  Byrd assessed osteoarthritis of the right knee and right knee pain.  R. 489.

On March 8, 2016, Jayne had an MRI of her right knee.  The MRI showed a tear of the lateral meniscus, minimal surface irregularities on the posterior horn medial meniscus; some localized thinning of the articular cartilage; joint effusion; and a small deep popliteal cyst.  R. 530.

On March 21, 2016, Jayne saw Dr. Joshua Poos, M.D., for insomnia.  R. 419-21.  Jayne said trazadone was not working.  She said she had Ambien before and it worked much better.  In a review of symptoms, Dr. Poos noted that Jayne was negative for anxiety and depression.  R. 419.  On examination, Jayne had a normal gait, full range of motion in her neck, was oriented, and had an appropriate affect, demeanor, and speech pattern.  Dr. Poos refilled the trazadone prescription and added a prescription for Ambien.  R. 420.

On March 29, 2016, Jayne saw nurse practitioner Byrd for a medication check and right knee pain.  R. 483-86.  Jayne reported pain in her neck, right shoulder, and right knee.  Her condition was stable.  Jayne wanted to continue

her Norco pain medication.  Jayne said her pain was then an 8 on a scale of 1 to 10.  She had no adverse side effects from the medication.  She reported moderate relief from the medication.  R. 478.  Jayne said she did not have any depression or anxiety attacks.  She had panic attacks and insomnia.  R. 484.  On examination, her mood was appropriate, and she had intact judgment and insight.  She had a normal gait with no assistive devices.  Her cervical spine was tender to palpation and positive for facet loading C2-C5.  She had edema on her right knee with tenderness on the medial joint line.  She had painful limited range of motion in the knee.  The drawer tests were negative.  She had normal strength and muscle tone in the right knee and shin.  R. 485-86.  Byrd refilled the prescription for Norco.  Byrd made an appointment for Jayne to see an orthopedic specialist for her right knee. R. 486.

On April 25, 2016, Jayne saw Dr. Poos for severe leg cramps.  Jayne said she had no numbness or weakness.  The cramps came and went all day long.  In a review of her symptoms, Dr. Poos said she was negative for depression and anxiety.  R. 422.  On examination, Jayne had a normal gait, full range of motion in her neck, was oriented, and had an appropriate affect, demeanor, and speech pattern.  Dr. Poos prescribed a muscle relaxant cyclobenzaprine.  R. 423.

On May 20, 2016, Jayne saw nurse practitioner Byrd for neck pain, bilateral shoulder pain, mid back pain, and right knee pain.  R. 478-82.  Jayne's pain was

chronic and stable.  Jayne wanted to continue her current pain medication of Norco and meloxicam.  Jayne reported that the medication "offers improvement in function, activities of daily living and quality of life".  Jayne had no adverse side effects from her medication.  R. 478.  Jayne said she was having a great deal of neck pain.  The pain seemed to go down her spine but did not radiate into the thoracic or lumbar areas.  She rated her pain as a 7 on scale of 1 to 10.  Jayne denied having depression or anxiety attacks, but said she had panic attacks and insomnia.  R. 479.  Jayne took a test for mental status.  The test showed no clinical significance for depression.  R. 480.  On examination, Jayne had a normal mood.  She had a normal gait and normal range of motion in all extremities.  She had tenderness in her thoracic spine.  Her lumbar spine had tenderness and muscle spasms on palpation.  She did not have subluxation, dislocation, or laxity in her lumbar spine.  Byrd refilled the prescription for Norco. R. 481.

On June 13, 2016, Jayne had x-rays of her thoracic and lumbar spine taken.  The x-rays of the thoracic spine showed mild degenerative disc space narrowing and osteophyte formation and very slight left convexity thoracic scoliosis; nothing seen was acute.  R. 436-37.  The x-rays of the lumbar spine showed moderate degenerative disc space narrowing involving the lumbar vertebra including at L5-S1, and moderate hypertrophic degenerative facet

disease throughout the post elements of the lumbar spine. Nothing acute was seen. The radiologist noted that an MRI might be beneficial for further evaluation. R. 438-39.

On July 15, 2016, Jayne saw nurse practitioner Byrd for neck pain, mid back pain, and shoulder pain. R. 468-71. Jayne reported pain throughout her spine. She said her neck was getting worse. She said she had numbness and tingling down her right arm into her hand. She dropped things with her right arm. She reported pain across her mid back and low back and rated her pain as a 6 on a scale of 1 to 10. Jayne said she could perform moderate activities due to her pain medication. R. 473. She denied that she had any depression or anxiety attacks. She said she had panic attacks and insomnia. R. 474. On examination, Jayne had a normal gait and normal range of motion in her extremities. She had an appropriate mood. Her cervical spine was tender on palpation. She had no subluxation, dislocation, or laxity in her cervical spine. The range of motion of her neck was restricted. She had normal strength and sensation in her neck. Spurling's sign was positive on the right. Facet loading was positive at C2-C5. Jayne's thoracic spine was tender throughout. Palpation of Jayne's lumbar spine was positive for tenderness and muscle spasms in paravertebral muscles. There was no evidence of subluxation, dislocation, or laxity in the lumbar spine.

Jayne's wrists and hands were normal with normal grip strength and Tinel's sign was negative. R. 475-76.[2] Byrd refilled the prescription for Norco. R. 476.

On September 9, 2016, Jayne saw nurse practitioner Byrd for joint pain, neck pain, and back pain. R. 468-71. Jayne reported that her pain was getting worse. She rated her pain as a 7 on a scale of 1 to 10. She said that the pain medication took longer to "kick in." She said the medication "offered improvement in function, activities of daily living and quality of life." She said the medication allowed her to engage in moderate activities and had no adverse side effects. R. 468. Jayne denied having depression, panic attacks, or insomnia. She reported having anxiety attacks. R. 469. On examination, her gait was normal, and she had normal range of motion in her extremities. Her cervical spine was tender to palpation. She had no subluxation, dislocation, or laxity in her cervical spine. Her neck had restricted range of motion, normal strength, normal sensation, was positive for Spurling's sign on the right, and was positive for facet loading. Here hands and wrists were normal with normal grip strength. R. 469-70. Byrd refilled her Norco prescription. R. 471.

On September 22, 2016, Jayne had an MRI of her cervical spine. The MRI showed mild abnormal cervical kyphosis with advanced chronic multilevel

---

[2] Tinel's sign is a tingling feeling in the hand when tapping on the median nerve at the wrist. See Dorland's, at 1716. The existence of Tinel's sign indicates carpal tunnel syndrome.

cervical spine degenerative disc disease/spondylosis which caused central stenosis and foraminal narrowing at multiple levels.  The findings were similar to the MRI done on January 14, 2015.  R. 527.

On October 3, 2016, Jayne saw nurse practitioner Byrd, for joint pain, neck pain, and back pain.  R. 463-67.  Jayne reported that her pain was constant but fluctuating in severity.  She rated her pain at the office visit at a 6 on a scale of 1 to 10.  She said her pain medication allowed her to engage in moderate activities.  R. 463.  Jayne denied having any depression, anxiety attacks, or panic attacks.  R. 464.  Jayne said the pain was always present.  Jayne reported that a Dr. Omotala had recommended total knee replacement surgery for her sometime before winter.  R. 463.  On examination, Jayne's mood was appropriate, she had a normal gait, and she had normal range of motion in all her extremities.  Her cervical spine showed no evidence of subluxation, dislocation, or laxity.  She had a restricted range of motion in her neck and normal strength in her neck.  Facet loading in her neck was positive.  Jayne's hands and wrists were normal with normal grip strength.  Byrd gave Jayne a list of neurosurgeons to see for a consult.  Byrd recommended resuming her hydrocodone medication for pain management. R. 466.

On November 7, 2016, Jayne saw nurse practitioner Byrd for joint pain, neck pain, and back pain.  R. 457-61.  Jayne said her pain was constant.  She

rated her pain at a 6 on a scale of 1 to 10.  Jayne reported no adverse effects from the medication.  She said the medication allowed her to engage in moderate activities.  R. 457.  Jayne denied having depression, anxiety attacks, panic attacks, or insomnia.  R. 458.  On examination, Jayne had a normal mood, a normal gait, and a normal range of motion in her extremities.  She had restricted range of motion in her neck, normal strength and sensation, was positive for facet loading, and had no evidence of subluxation, dislocation, or laxity.   Byrd refilled Jayne's Norco prescription.  R. 460.

On December 1, 2016, Jayne saw surgeon Dr. Jeffrey Cozzens, M.D. for evaluation and consultation.  Jayne reported severe neck pain that radiated down to both shoulders and into her right arm.  R. 425-27.  In a review of symptoms, Dr. Cozzens noted no mood change, anxiety, or memory loss.  R. 426.  On examination, Jayne's gait and station were normal.  She had tenderness on the back of her neck and shoulder.  She had numerous trigger points that reproduced her pain when palpated.  Straight leg tests were negative.  Her mood and affect were normal.  Dr. Cozzens stated that the MRI of her cervical spine showed kyphosis and spondylosis.  Dr. Cozzens noted significant central stenosis and foraminal narrowing at C5-6 and also at C4-5, also worse on right than left.  Dr. Cozzens could not tell if her arm pain was radicular or fibromyalgia.  Dr. Cozzens recommended physical therapy.  Dr. Cozzens assessed neck pain.

Dr. Cozzens recommended that the pain clinic should determine whether she had fibromyalgia.  Dr. Cozzens said surgery could help relieve radicular pain, but not fibromyalgia.  Dr. Cozzens said Jayne should first try conservative treatment including physical therapy before considering surgery in any event. R. 427.

On January 1, 2017, Jayne saw nurse practitioner Byrd for joint pain, neck pain, and back pain.  R. 452-56.  Jayne reported that she was doing physical therapy and waiting to see a rheumatologist to be evaluated for fibromyalgia. Jayne said hydrocodone "offers improvement in function, activities of daily living, and quality of life."  R. .452.  Jayne rated her current pain at 4 on a scale of 1 to 10.  Jayne said the pain was always present.  Jayne denied having depression, anxiety attacks, panic attacks, or insomnia.  R. 453.  Byrd administered a screening test for depression.  The results were negative for depression.  R. 454. On examination, Jayne had a normal gait, normal range of motion in her extremities, and an appropriate mood.  Byrd confirmed four trigger points for pain.  Byrd refilled the Norco prescription.  R. 455.

On March 6, 2017, Jayne saw nurse practitioner Byrd for joint pain, neck pain, muscle pain, and joint pain.  Jayne rated her pain as a 4 on a scale of 1 to 10.  Jayne reported that she was "on hold with the neurosurgeon right now." They want her to see rheumatology first . . ."  Jayne said she had to wait to see rheumatology because of her insurance.   Jayne said that her "medication is

helpful and allows her to complete her daily activities." R. 447. Jayne was taking pain medications Norco, Lyrica, and meloxicam, and a muscle relaxant cyclobenzaprine. R. 447. Jayne denied having depression, anxiety attacks, panic attacks, or insomnia. R. 448.

On examination, Jayne had a normal gait without an assistive device and normal range of motion in all her extremities. Her mood and affect were appropriate. R. 449. Byrd refilled the Norco prescription. R. 450.

## THE EVIDENTIARY HEARING

On May 23, 2017, the Administrative Law Judge (ALJ) conducted an evidentiary hearing. R. 36-81. Jayne appeared in person and with her attorney. Vocational expert Gary Weimholt also appeared at the hearing by telephone. R. 37, 39. R. At the beginning of the hearing, Jayne amended her claim to allege that she became disabled on January 1, 2015. R. 40, 226.

Jayne testified that the primary reason she could not work was "extreme neck pain." R. 41. She said that due to her pain she could not lift, sit, or stand. She said she had to lie down. R. 42. She could not lift a gallon of milk or sit for more than 20 minutes. She would get a burning, sharp pain in her neck and need to take pain medication and lie down. R. 42. She rode in a car for an hour to get to the hearing and had to recline her seat and "lay down" during the trip. She said she took Norco before the trip and slept most of the trip. R. 43. Jayne

testified that her neck pain was always present. She said that reaching and turning her head made the pain worse. R. 44.

Jayne said that she has received injections in her neck and has tried physical therapy. Jayne opined that the physical therapy made her neck worse. She said she might have surgery on her neck. She said that the neurosurgeon recommended seeing a rheumatologist before considering any neck surgery. R. 46-47, 65. She was told that the surgery would only have a 50 percent chance of making her neck any better. R. 65.

Lying down alleviated her pain a little. She lay down four times a day, for one to two hours each time. She said she lay down for eight hours the day before the hearing. R. 47. Sitting made the pain worse. She was sitting during the hearing and said that she was experiencing sharp, burning pain in her neck at that time. R. 48.

Jayne had numbness and tingling that went down to her fingers in both hands. The numbness was worse on the right. She said her arms and hands became numb four to five times a day. Picking up a cup of coffee or other grabbing caused her hand to go numb. She would sometimes drop objects because her hands were numb. She did not have any grip strength when her hands were numb. R. 44-45. The numbness lasted from five minutes to an hour. R. 46. Jayne said she had problems buttoning and tying shoelaces because of

the numbness in her hands.  She did not know if she could pick up a penny off a table.  R. 59.

Jayne's lumbar spine and right knee also caused her pain.  She had to lie on her side because of her back pain.  She said that her back pain caused numbness down her legs.  Some of her leg pain and numbness was caused by arthritis in her hip.  She said that heat sometimes made her back pain a little better.  R. 49.  Jayne had pain in her right knee from a torn meniscus.  A brace sometimes made her knee feel better.  Her knee was swollen "pretty much all the time."  Walking and standing made the swelling worse.  R. 57.

Jayne had problems with her right shoulder.  She said that she could not grab or reach with her right arm because of her shoulder.  She said that the doctors said they might be able to perform surgery on her shoulder but recovering from the surgery would take a "extremely long time."  R. 56.  The surgeons also could not guarantee that the surgery would help her condition.  R. 56-57. She said that physical therapy for her shoulder made her neck worse also.  R. 65.

Jayne also had arthritic pain in her hip and numbness in her feet.  R. 59-60.  She said her ankles swelled "real bad."  R. 60.  She elevated her feet to reduce the swelling.  R. 60.

Jayne's pain limited her ability to do household chores including washing dishes, vacuuming, and cooking.  She said she could not stand and do anything. R. 50.  She could not clean regularly because of the pain.  She could do cleaning for a maximum of 30 minutes and then she had to lie down.  R. 51.  She last made a "decent meal" a month before the hearing when she cooked a steak on the stove top.  She said she did not feel like eating after she cooked it because she felt worse from standing to cook.  R. 50. Jayne took care of her pet bird and dog.  She could not walk the dog around the block.  She attached the dog to a cable and let it go outside.  Jayne said a friend Melissa Meters did much of the vacuuming for her.  Meters also took out the trash and did Jayne's grocery shopping for her.  Meters also "sets up" Jayne's medications.  R. 52.  Jayne took care of her personal car, but had difficulty washing her hair and dressing.  R. 53.

Jayne mowed her lawn with a riding mower.  She would ride the mower for five to 10 minutes before she had to rest.  Riding the mower caused pain in her lower back and neck.  She felt worse after she finished mowing the yard.  R.53-54.

Jayne said her pain interfered with her concentration.  She could not read a newspaper because of her pain.  She said in her Function Reports that she played games on her phone.  She said at the hearing that all she could do with her phone was look at pictures on Facebook.  R. 54-55. She could not read text

on Facebook.  She forgot things.  Her friend set up her medications in a daily medicine planner because she was so forgetful.  R. 55.

Jayne said she could not work at a desk with an option to stand because she would be in too much pain.  She would have to lie down.  R. 54.

Jayne said she had problems with fatigue.  She said she had no interests in things.  She was tired all the time.  She said she had no desire or energy because of the pain.  She said the pain was depressing.  She felt worn out all the time.  She napped more than once a day.  Her pain interrupted her sleep at night. R. 61-62.

Jayne said her anxiety would limit her ability to work.  She did not like being around people she did not know.  R. 62.  She avoided being in groups of people "at all costs."  R. 63.  She would avoid a group of four or five people if she did not know them.  She had a hard time leaving the house.  She left her house only if she did not have to.  R. 62.  She said her mind raced worrying things.  She was depressed because she could not do things she used to do.  R. 63.

Jayne said the reference in the medical records to her drinking six beers a day was wrong.  She said the doctor misunderstood her or she misunderstood the doctor's question.  She said she could not mix alcohol with her pain medication.  She said she drank minimally.  R. 64-65.

Vocational expert Weimholt then testified. The ALJ asked Weimholt the following hypothetical question:

> For the first hypothetical, would you assume that the individual could perform at the light exertional level, no ladders, ropes or scaffolds, occasional ramps and stairs, frequent reaching, but only occasional overhead reaching with the right upper extremity? Let me take the question mark out of the dominant, because we do, in fact, know she is right handed. And, occasional stooping, crouching and crawling. Could that hypothetical individual perform any of the claimant 's past work?

R. 75-76. Weimholt opined that the person could perform Jayne's prior work as a security guard and home attendant. R. 76. Weimholt also opined that the person could perform the jobs of cleaner/housekeeper. He said there were 130,000 such jobs in the national economy. The person could also perform the job of Cashier, with 300,000 such jobs in the national economy. Last, the person could be a small parts assembler, with 12,000 such jobs in the national economy. Weimholt said these three jobs were examples of the types of jobs the person could perform. R. 76-77.

Weimholt that if the person was limited to sedentary work with the other limitations in the hypothetical, the person could not perform Jayne's prior relevant work. Weimholt could identify only one job such a person could perform, a surveillance system monitor, with 8,800 such jobs in the national economy. R. 78-79.

Weimholt said the person could not work if she was off task 20 % of the time or if she was absent three or more days a month.  R. 79.  The person also could not work if she had to lie down for any length of time during the workday.  R. 80.  The hearing concluded.

<u>THE DECISION OF THE ALJ</u>

On August 14, 2017, the ALJ issued her decision.  R. 19-31. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Jayne met her burden at Steps 1 and 2.  She was not engaged in substantial gainful activities and she had severe impairments of degenerative disc disease, cervical spine; right shoulder bursal surface tearing of the far anterior fibers of the supraspinatus tendon as well as moderate tendonosis and moderate osteoarthritic changes; moderate degenerative changes in the right hip; and remote right knee meniscus tear.  R. 22.

The ALJ also found at Step 2 that Jayne's mental impairments were not severe. The ALJ relied on the numerous office visits in which Jayne had normal mood, affect, insight, and judgment and many office visits in which she denied

any depression, anxiety, or panic attacks. The ALJ noted that Jayne only once reported that she had little interest or pleasure in doing things at her April 23, 2015 office visit with Dr. Greene. Even then, Jayne denied feeling depressed or hopeless. R. 22, 389. The ALJ acknowledged that Jayne reported anxiety or panic attacks at some office visits with nurse practitioner Byrd but relied on the fact that Byrd found that Jayne's mood and affect were appropriate even at those appointments. R. 22. The ALJ also relied on the three self-administered screening tests that Jayne took at Byrd's office that were either negative for depression or subthreshold for depression. R. 22.

The ALJ considered the four functional areas Part B of the Listings for mental impairments. Listing 12.00(1)(b).[3] The ALJ found no limitations on understanding, remembering, or applying information. The ALJ relied on the evidence of Jayne's ability to use and follow Facebook, to operate a riding lawn mower, and her statements in her February 25, 2015 Function Report that she did not need reminders to do things and she could follow written and spoken instructions. The ALJ found Jayne had no problems interacting with others. She had a close friend who bought groceries for her, she received visitors in her

---

[3] Effective January 17, 2017, the Commission amended the four functional areas used in Part B of the Listings for mental impairments. 81 Fed. Reg. 66138-01, 66161, 2016 WL 5341732 (September 26, 2016). Drs. Henson, and Biscardi issued their opinions prior to the effective date of the amendment. The ALJ used the amended wording for these categories. The original and amended functional areas are sufficiently similar that the Court can follow the ALJ's analysis. Jayne does not challenge the ALJ's opinion on this ground.

home, and she acted appropriately at her doctor's offices. The ALJ found no limitations in adapting or managing oneself. The ALJ relied on the fact that she maintained her personal hygiene and did household chores to the extent that her physical limitations allowed. Last, the ALJ found that she had mild limitations in concentrating, persisting, or maintaining pace. The ALJ relied on Jayne's Function Report that she cooked simple meals, handled her finances, watched television, read, and played games on her smart phone. R. 22-23. The ALJ concluded that because she only had mild limitations in these areas, her mental impairments were not severe, citing the Listing provision that so states. R. 23; see 20 C.F.R. 404.1520a(d)(1) (If functional impairments are mild or nonexistent in the four functional areas, the impairment is non-severe).

The ALJ acknowledged that Dr. Vincent assessed major depression with anxious distress in his 2014 consultative mental status exam. The ALJ discounted the assessment because it occurred before the amended alleged onset date of January 1, 2015. The ALJ also discounted it because the medical records do not show that Jayne sought care from any mental health professional during the relevant period. R. 22. The ALJ also gave little weight to the opinions of Drs. Henson and Biscardi. The ALJ said that the objective medical evidence failed to support their findings. R. 27.

At Step 3, the ALJ found that Jayne's impairments or combination of impairments did not meet or equal any Listing.  The ALJ considered Listing 1.02 for major joint dysfunction and 1.04 for disorders of the spine.  R. 23-24.

At Step 4, the ALJ found that Jayne had the following RFC:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can never climb ladders, ropes, or scaffolds. She can only occasionally climb ramps or stairs. She can frequently reach but can only occasionally reach overhead with the right dominant upper extremity.  She can only occasionally stoop, crouch, or crawl.

R. 24.  The ALJ relied on the numerous examinations that found normal gait, normal range of motion in the extremities, and normal strength or near normal strength.  The ALJ relied on Jayne's representation to Byrd that she could perform daily activities while on her pain medication and that her pain medication had no adverse side effects.  The ALJ relied on Dr. Leung's consultative examination in which Jayne had slight decreased weakness on the right upper extremity and full range of motion left upper extremity and in her cervical spine. The ALJ also relied on Dr. Chang's RFC determination that she could perform a limited range of light work.  The ALJ gave less weight to Dr. Pardo's finding that she could perform medium work because of medical evidence submitted after he rendered his opinion.  The ALJ also gave only partial weight to Dr. OConnor's

2013 opinion because he rendered the opinion almost 2 years before the January 1, 2015 onset date.  R. 24-28.

The ALJ gave little weight to Jayne's testimony because it was inconsistent with the other evidence submitted.  The ALJ noted that Jayne told Dr. Pleszynski-Platz that she worked mowing lawns.  The ALJ noted that Jayne told Byrd that she could perform her daily activities with her pain medication and had no side effects.  The ALJ noted that no medical record stated that she had to lie down for hours each day due to her pain.  No medical record confirmed that she had swelling that necessitated elevating her leg for extended periods.  The ALJ also noted that she was not prescribed a cane and she lifted the cane while she walked at Dr. Leung's consultative examination.  The ALJ noted that examination records often showed that she had normal strength in her extremities and no health care professional ever recommended limitations on her activities.  R. 28-29.

The ALJ determined at Step 4 that Jayne could not perform her prior relevant work due to her RFC.  R. 29.  At Step 5, the ALJ found that Jayne could perform work that existed in significant numbers in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404 Subpart P, Appendix 2, and vocational expert Weimholt's opinions that she could perform the representative jobs of cleaner/housekeeper, cashier II, and small parts

assembler.  The ALJ further relied on Weimholt's opinions that 130,000 cleaner/housekeeper jobs exist nationally, 300,000 cashier II jobs exist nationally, and 12,000 small parts assembly jobs exist nationally.  R. 29-30.  The ALJ concluded that Jayne was not disabled.  R. 30.

Jayne appealed the ALJ's decision.  On May 21, 2018, the Appeals Council denied Jayne's request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1. Jayne then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if supported by substantial evidence and may not substitute its judgment or reweigh the evidence.  Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-

3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms). The ALJ must articulate at least minimally her analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  The ALJ's decision that Jayne's mental impairments were non-severe was supported by the consistent normal findings of her mood, affect, insight, and judgment at her medical appointments, her repeated reports at her medical appointments (particularly with Byrd) that she was not depressed; she also often reported that she had not experienced either anxiety attacks or panic attacks.  The finding was also supported by the fact that Jayne did not seek any care from mental health professionals from at least 2012 to 2017.  The ALJ acknowledged Dr. Vincent's consultative examination and Drs. Henson and Biscardi's mental RFC opinions, but discounted them because they were inconsistent with the medical records presented.  The ALJ explained the basis for the weight given to these opinions, and the Court will not reweigh the evidence.  Jens, 347 F.3d at 212; Delgado, 782 F.2d at 82.  The medical records provide substantial evidence.

The ALJ's RFC determination is also supported by substantial evidence. The evidence showed that Jayne had impairments to her spine, shoulder, hips, and right knee, but she also had normal strength or near normal strength, normal gait, and normal range of motion in her extremities. The consultative examination of Dr. Leung and the opinions of Dr. Chang also supported the RFC finding. All of this evidence supports the finding that she could perform a limited range of light work.

The ALJ also cited substantial evidence to support her decision to give less weight to Jayne's testimony about the limiting effects of her pain. Jayne testified that she could only stand or sit for 30 minutes or less and had to lie down for hours at a time during the day. The ALJ correctly noted that she did not ever tell any health care professional that she had to lie down for hours every day because of her pain. Indeed, Jayne consistently and repeatedly told Byrd from July of 2016 through March of 2017 that she could perform moderate activities or could perform her activities of daily living when she took her pain medications, and she had no adverse side effects from her pain medication. The testimony of Jayne took place in May, 2017. The ALJ noted specifically that Jayne told Byrd that she could perform all her daily activities when on her pain medication and had no adverse side effects in March of 2017. R. 28-29. The ALJ further noted that Jayne told Dr. Pleszynski-Platz that she worked mowing lawns. This

statement to Dr. Pleszynski-Platz clearly contradicted her testimony. The ALJ had ample evidence to give little weight to Jayne's testimony.

Jayne argues that the ALJ failed to build a logical bridge from the evidence to her conclusions regarding Jayne's physical impairments and her RFC. Jayne argues that the ALJ cherry-picked the record to cite only evidence that supported her finding. The Court disagrees. The ALJ reviewed the record thoroughly and considered all the relevant evidence. Jayne essentially asks the Court to reweigh the evidence. The Court may not do so. See Jens, 347 F.3d at 212; Delgado, 782 F.2d at 82. . The ALJ's findings are supported by substantial evidence.

Jayne argues that the ALJ did not properly consider the weight to be given to Jayne's testimony regarding the effect of her symptoms and pain on her RFC. Jayne again argues that the ALJ cherry-picked the record. The Court again disagrees. The ALJ thoroughly reviewed the record. Jayne again wants the Court to reweigh the evidence. That would be error. Jens, 347 F.3d at 212; Delgado, 782 F.2d at 82. As discussed above, substantial evidence supports the ALJ's conclusions regarding the weight she gave to Jayne's statements regarding the effect of her pain and other symptoms.

Jayne also argues that the ALJ erred in finding that her mental impairments were non-severe at Step 2. She argues that the ALJ did not have a basis to

reject the opinions of Drs. Vincent, Henson, and Biscardi.[4] Jayne also notes that she was prescribed the anti-anxiety medication Zoloft.  This issue is closer than the others raised by Jayne.  She was taking Zoloft and the psychologists found some moderate functional limitations.  Drs. Vincent, Henson, and Biscardi, however, were not treaters.  Her treating physicians and other healthcare professionals consistently found normal insight, judgment, mood, and affect.  Moreover, three screening tests showed no depression.  These psychologists did not consider these subsequent medical records.  The ALJ found that the consistent evidence of normal mental findings in most examinations outweighed the non-treating psychologists' opinions.  The Court again will not reweigh the evidence.  Jens, 347 F.3d at 212; Delgado, 782 F.2d at 82. The Court sees no error.

THEREFORE, IT IS ORDERED that Defendant Commissioner's Motion for Summary Affirmance (d/e 19) is ALLOWED, Plaintiff Lisa Louise Jayne's Motion for Summary Judgment (d/e 16) is DENIED, and the decision of the Commissioner is AFFIRMED.  All pending motions are denied as moot.  THIS CASE IS CLOSED.

---

[4] Jayne erroneously asserts that Drs. Pardo and Chang opined on Jayne's limitations due to her mental impairments.  Brief in Support of Plaintiff's Motion for Summary Judgment (d/e 17), at 20.  They did not.  See R. 87-88, 113-15.  Jayne also erroneously stated that Dr. Henson was a psychiatrist.  Dr. Henson held a Ph.D., not an M.D.  See R. 89.  Dr. Henson was not a psychiatrist.

ENTER:  July 25, 2019

_____s/ Tom Schanzle-Haskins_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE